John Edward SWIFT, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–74–657.

Court of Criminal Appeals of Oklahoma.

Dec. 30, 1974.

Arthur Stevener, Jr., Weaver & Stevener, El Reno, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., James D. Bednar, Legal Intern, for appellee.

## OPINION

BLISS, Presiding Judge:

The appellant, John Edward Swift, hereinafter referred to as defendant, was charged, tried before a jury and convicted in the District Court of Canadian County, Oklahoma, of the crime of Murder. Punishment was assessed at imprisonment by hard labor in the state penitentiary for life. From a judgment and sentence in conformance with said verdict, the defendant has perfected his timely appeal.

The evidence adduced at trial is as follows: Lee Murry Jurode testified that he was presently an inmate at the Huntsville State Penitentiary in Texas serving a life sentence for a murder and robbery committed by the witness, the defendant, Joann Adams, and Robert Nogales Duron in Hearne, Texas, on or about the 16th of May, 1972; that the name of the family robbed and murdered was Kelly; and that they had taken a couple of guns and some clothing. After the incident on or about the 18th, the four drove to Oklahoma City and took an apartment. On the 19th the witness, the defendant and Ms. Adams left Duron at a cafe near the apartment. When they returned a few hours later, the defendant got out of the car, went into the cafe, and then came out running. Jurode followed him around the corner and up the stairs to the apartment where they found Duron lying asleep by the door in front of the apartment apparently drunk. Swift subsequently woke Duron and told him to go to bed. A few minutes later the defendant told Duron to put on his clothes

and said that they were going for a ride. The witness then overheard the defendant tell Duron, "You might have talked." Duron responded, "No, I didn't talk, Johnny." The witness stated that the defendant and Duron were making reference to the incident that happened in Texas. Jurode made the comment, "Give him a chance," and the defendant told him to be quiet. The four then left the apartment and defendant drove until they came to "some kind of a factory with a lot of lights on it", and turned off the road and parked. The defendant told both the witness and Duron to get out, which they did. He then told Jurode to take Duron's wallet. Duron gave Jurode the wallet and then said, "Don't kill me, Johnny." Jurode then watched Duron walk towards a ditch and saw the defendant point a gun towards Duron's head and heard one shot. Duron fell and then the defendant went down in the ditch, bent over and the witness heard two more shots. Jurode then got in the car and Ms. Adams said, "Wonder who's going to be next, me or you?" Swift then got back in and drove back to Oklahoma City.

The next morning Jurode asked the defendant if he could go down to the cafe and get a beer. The defendant acquiesced and Jurode went to the cafe and called a detective in Albuquerque and told him what had happened in Hearne and what had subsequently happened to Duron. However, the defendant came into the cafe before the witness could tell the detective where they were. On cross-examination Jurode stated that on the following Monday morning he placed another call to the detective and told him where they were. The three were subsequently arrested.

The State then called Joann Adams who testified that prior to May 20, 1972, she, the defendant, Jurode and Duron were involved in some trouble in Albuquerque and that they then left and went to Hearne, Texas. She further stated that she found out later through Jurode and Duron that they had killed a banker and his family in Hearne. The four then left and went to

Oklahoma City, arriving on or about the 19th, where they rented an apartment. That evening upon returning to the apartment they found that Duron passed out in the hall. The defendant and Jurode took him in the apartment and "John Swift started fussing at him about being drunk and saying that he couldn't stand a drunk because drunks talk." The defendant further stated that he was going to have to kill Duron because he thought he had talked about the other crimes they had committed in New Mexico and Texas. Jurode spoke up and asked the defendant not to kill Duron. While the witness was getting her coat, the defendant got in her purse and took a .22 caliber pistol which she had been carrying pursuant to the defendant's orders. She then identified State's Exhibit No. 7 as the gun in question.

They subsequently drove to a factory area where they pulled off the road and the defendant got out of the car. The factory area was lit and the witness was able to see what transpired. The witness then related as follows:

"Robert Duron—John Swift told Robert Duron to get out of the car and Robert Duron got out of the car and he then told—and he went back around to the back end of the car, he had—sounded like he said, 'Jurode.' Robert asked him not to kill him and he told him not to beg him and he called Jurode out of the car and told Jurode to get his identification, his watch and his ring, and his ring didn't come off, so at this time I guess Jurode was asking him not to kill him, because he pushed Jurode against the car. He then, seems like he was behind, he was walking towards the gate or back up towards the gate and I heard three shots."

When asked if Swift said anything while driving back to Oklahoma City, the witness stated that the only thing he said was, "I should have shot the ring off his finger." The witness further related that the next morning the defendant got up, read the

newspaper and then said, "Sorry, I had to do it, it was either him or me."

On cross-examination Ms. Adams stated that when they were arrested she was carrying the .22 caliber pistol in her purse and that there were other guns in the apartment, including shotguns taken from Hearne, Texas. She further stated that when the shots were fired, she was looking the other way and did not see who actually fired the shots.

W. M. Spalding then testified that on the morning of the 20th he was traveling near the O.G. & E. Mustang plant in Canadian County when he discovered a body lying in a ditch. Oklahoma City Police Officer W. G. Fansler then testified that he worked in the police crime lab and on the 20th he took photographs of the scene which were subsequently introduced into evidence. He further stated that he subsequently went to the University Hospital Morgue where an autopsy was performed on the victim and received three small projectiles which had been removed from the victim's head. Officer Larry K. Upchurch then testified concerning the arrest of Jurode, Adams and the defendant. He stated that the .22 caliber revolver identified as State's Exhibit No. 7 was subsequently found in Ms. Adams' purse.

Detective Aaron J. Clovis also testified concerning the arrest. He further stated that prior to the arrest, a search warrant was obtained to search the apartment where they found numerous articles owned by the Kelly family and the victim, Duron. Ray Lambert, Firearms Examiner for the Oklahoma State Bureau of Investigation, testified that he had examined the slugs obtained from the medical examiner's office and the .22 pistol. Due to the condition of the bullets, he could only determine that they were .22 caliber. Dr. A. J. Chapman then testified that he was a forensic pathologist serving as Chief Medical Examiner for the State of Oklahoma. He superficially examined the body at the scene and then ordered it transported to the morgue where a more detailed examina-

tion was made. He reported that there were three gunshot wounds to the head, that the shots were fired close enough to cause "powder stippling" about the wounds and that any of the shots could have caused death. The State then rested and no evidence was presented by the defendant.

The defendant's first proposition in error urges that the trial court committed error in admitting evidence concerning other crimes committed by the defendant in New Mexico and Texas. With this contention we cannot agree. A careful examination of the record reflects that evidence of the crimes committed a short time prior to the Duron murder was properly admitted to show the motive for the execution style murder. Generally, evidence of separate and similar offenses is not admissible against an accused on trial for another specific crime. Roulston v. State, Okl.Cr., 307 P.2d 861. However, evidence of separate and similar offenses is admissible when it is material to establish motive. Moulton v. State, Okl.Cr., 476 P.2d 366, and Turnbow v. State, Okl.Cr., 451 P.2d 387.

Defendant's last proposition urges that the defendant was denied a fair trial by the trial court's denial of a change of venue made necessary by pre-trial publicity. It is abundantly clear from the lengthy voir dire examination appearing in the record that the trial court gave the defendant very wide latitude in examining the perspective jurors and that all jurors composing the final panel stated that they would decide the case based upon the evidence presented at trial and not from what they had heard or read. There is no evidence of an abuse of discretion by the trial court in the instant case.

This Court cannot require that a juror not read articles or see reports of a case in the news media. It is sufficient that a juror can lay aside his opinion, if any, and render a verdict based on the evidence presented to him in court. Sam v. State, Okl.Cr., 510 P.2d 978.

After consideration of the lengthy record as a whole, we do not find that the defendant has been deprived of any substantial right. The issues were fairly presented to the jury, and the defendant received a fair and impartial trial. The verdict and judgment appealed from are, accordingly, affirmed.

BRETT and BUSSEY, JJ., concur.